| | | |
|---|---|---|
| ALAIN SEHEUT, | ) | IN THE |
| 10 Bonton Court | ) | |
| REISTERSTOWN, MD 21136 | ) | |
| *Plaintiff* | ) | CIRCUIT COURT |
| | ) | |
| v. | ) | FOR |
| | ) | |
| PPE CASINO RESORTS | ) | ANNE ARUNDEL COUNTY |
| MARYLAND, LLC | ) | |
| 7002 Arundel Mills Cir Ste 7777 | ) | |
| Hanover, MD, 21076-1280 | ) | CASE NO. |
| | ) | |
| *Defendant* | ) | |

_____

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, ALAIN SEHEUT, by and through counsel, hereby brings forth this action and states as follows:

### INTRODUCTION AND NATURE OF THE ACTION

1. Plaintiff ALAIN SEHEUT (hereinafter "Mr. Seheut") was constructively discharged on July 22, 2024, from his employment with PPE CASINO RESORTS MARYLAND, LLC (hereinafter the "Casino" or "Defendant").

2. Defendant operates a casino that is open 24 hours a day and serves alcohol.

3. The gambling industry inherently requires special attention to security concerns due its potentially volatile customer base who are prone to intoxication and emotional stress. Whenever the public is directly engaging in gambling and drinking, there is a potential for violence, especially directed at the Casino staff.

4. Every casino, including Defendant, spares no expense to protect the financial interests of the business, including cameras to monitor cheating and theft.

5. This Casino, however, does not value the physical and emotional wellbeing

1

of its staff the same way that it values its money and does not adequately allocate resources to maintain the security and safety of its employees the same way that it does for its money.

6. Mr. Seheut was physically battered and assaulted, and verbally assaulted by multiple patrons over a period of over ten years while employed at the Casino.

7. Mr. Seheut attempted on multiple occasions throughout his over 10 years of employment to report the conditions of employment and to encourage the Casino to enhance security.

8. The Casino did not address Mr. Seheut's concerns, and instead retaliated against him by demoting him, assigning him to deal at tables that received less tips, and assigning him a punitive shift schedule.

9. The Casino employs many immigrants, including Mr. Seheut. Knowing that immigrants are especially vulnerable, the Casino exploits this vulnerability to its advantage.

10. Mr. Seheut seeks an award from this court for compensatory damages, punitive damages, statutory damages, emotional distress, attorneys' fees, and court costs.

## PARTIES

11. Plaintiff ALAIN SEHEUT is a resident of the state of Maryland.

12. Defendant PPE CASINO RESORTS MARYLAND, LLC. is a corporation having its principal place of business in Maryland.

## JURISDICTION AND VENUE

13. Jurisdiction is proper pursuant to Md. Code Ann., Cts. & Jud. Proc. § 1-501 and § 6-102, because the Casino's place of business is in Maryland.

14. Venue is proper pursuant to § 6-201 because the Casino's principal place of business is in Anne Arundel County.

**FACTS**

15. On April 1, 2013, Mr. Seheut was hired by the Casino as a dealer and worked at the Casino as a dealer until July 22, 2024.

16. During Mr. Seheut's employment at the Casino, he had a perfect record and was never subject to any discipline or reported on for any infractions.

17. There is a high turnaround rate with Casino employees, and it is highly unusual for a dealer to stay employed at the Casino for more than three years.

18. Mr. Seheut was employed for just over ten years.

19. He was popular and well-liked by many of the patrons and other employees.

20. Because of his unusually long tenure, his perfect employment record, his skill, and his experience, Mr. Seheut had senior status and was entrusted with dealing at the high limit tables, Pit 7.

21. In the first few years of his employment, Mr. Seheut was verbally and physically assaulted by patrons.

22. On several occasions, Mr. Seheut was pushed, shoved, and a violent patron almost punched Mr. Seheut.

23. Almost every shift he worked he was verbally assaulted by patrons.

24. This was a common experience and well-known among the Casino staff, including other dealers, waitresses, and bartenders.

25. Throughout his employment at the Casino, he personally witnessed multiple employees who were subject to extreme acts of physical violence and verbal abuse.

26. Employees are regularly harassed, yelled at, cursed at, and sometimes spit at and/or spit on, and even threatened by Casino patrons, who are often angry about losing money

and/or intoxicated from alcohol they had consumed at the Casino.

27. Many patrons who regularly came to the Casino threw objects in anger.

28. These acts were all captured on the Casino's security footage.

29. Though the Casino will occasionally instruct a security officer to ask a patron to leave, it is well-known and common for the Casino to allow a frequent offender to return to the Casino if that patron is a regular who often comes to gamble and provide the Casino with revenue.

30. The vast majority of the security guards that are employed by the Casino are unqualified and do not adequately respond to threats to the safety of Casino employees, including Mr. Seheut.

31. Dealers, waitresses, and bartenders sometimes respond to potentially dangerous situations involving angry and/or intoxicated patrons, even though this is not in their job description and should be addressed by security personnel. On many occasions the supervisors that were called for assistance with potentially dangerous patrons, did very little to assist the situation and even would tell Mr. Seheut that he needed to have "a thicker skin".

32. Mr. Seheut has personally on more than one occasion physically or verbally responded to angry and violent patrons, putting himself in harm's way.

33. The patrons are not deterred from bad behavior by the security guards because they know that the guards will not respond to violence unless it is extreme, and they do not fear that they will be permanently barred from the Casino for bad behavior.

34. All employees who are below management level fear for their safety on a regular basis. Many employees that verbally raise issues about safety concerns were told this is a Casino not a church, you need to have a tougher skin, and if its "that bad" go get another job.

35. The management of the Casino is well aware that the employees legitimately fear for their safety but rarely take measures to address these concerns.

36. The employees typically do not report their concerns to the management because they believe that the management is aware of the situation and fear that the only result of reporting their concerns will be retaliation.

37. The employees regularly discuss their safety concerns among themselves.

38. The employees also regularly discuss their common fear of reporting these concerns with the management and their belief that reporting the situation will only lead to retaliation by the management.

39. Over the years, employees have been injured at work, including an employee who was raped in the parking lot and an employee that was head butted.

40. The news has reported on multiple violent crimes that occurred outside the Casino in areas where Mr. Seheut and other employees must walk, sometimes late at night.

41. It is well known among the employees and the management that some of the lights and security cameras outside the Casino are inoperable and do not provide adequate security or deterrence, especially at night. Additionally, often when employees would leave the Casino there was no security presence in or around the darkened parking lot.

42. The Casino does not regularly or properly assign security guards to monitor the parking lot.

43. For the first few years of his employment, Mr. Seheut like the other employees, did not report his concerns officially in writing to the management for fear of retaliation.

44. After many years of employment, the situation became untenable. The incidents of physical abuse were common enough and serious enough that Mr. Seheut legitimately feared that he was in imminent danger of serious bodily injury.

45. Additionally, the constant fear of physical abuse, as well as the constant verbal abuse, was causing him to suffer emotional stress, depression, loss of sleep, and even physical symptoms.

46. In 2022, Mr. Seheut made his first official and written report of his concerns.

47. He suggested that the Casino implement a "customer code of conduct" that the Casino would make it a violation of Casino rules to physically or verbally assault or threaten an employee, or make derogatory remarks about the ethnic origin, race, accent, or assumed religion of any employee or other patron.

48. Mr. Seheut made suggestions for unacceptable behaviors to be included in a "code of conduct" for patrons. His supervisors developed and implemented a Code of Conduct that not did include any of his suggestions, was vague and ambiguous.

49. The Casino placated Mr. Seheut by hanging a "code of conduct" sign they created in a very small font and placing it above the security desk where when security personnel are seated or standing there, the sign is partly obscured, and very few people would stop to read it.

50. The Casino intentionally made the Code of Conduct vague and ambiguous.

51. It was not enforced by the Casino.

52. No other actions were taken by the Casino to address his concerns.

53. Mr. Seheut even heard managers mocking the "code of conduct" he requested. It was not taken seriously by anyone at the Casino.

54. After the "code of conduct" was placed on display by the Casino to placate Mr. Seheut, and the Casino continued to refuse to ensure the safety of Mr. Seheut and his fellow table game employees, Mr. Seheut made a formal complaint about the safety concerns.

55. Mr. Seheut had tried to avoid formally complaining to his supervisors for years because the Casino has a reputation for retaliating against any employee that complains about safety and security concerns.

56. Mr. Seheut made his first formal complaint about security and safety concerns in 2022.

57. Mr. Seheut's formal complaint was immediately met with aggression from the Casino.

58. The Casino took very few actions whatsoever to address his concerns.

59. Mr. Seheut continued to pursue his complaint because he knew his health would not improve and would continue to get worse if the Casino did not address his security and safety concerns.

60. Shortly after Mr. Seheut filed his complaint to his supervisors, Mr. Seheut's assigned shift schedule was drastically and negatively altered.

61. At the time of Mr. Seheut's formal complaint, he had seniority due to being employed with the Casino for over ten years and his perfect employment record.

62. Mr. Seheut was most often scheduled for shifts to work the "high rollers" tables, Pit 7. His preferred game to deal was Roulette.

63. Mr. Seheut's shift schedule was the envy of other dealers because the hours were manageable, and because he was a highly skilled dealer sought after to work at high limit tables and high limit Pit 7 where the players were somewhat more well-behaved so the danger of

7

physical and verbal abuse, though present, were less than the danger that exists at the tables with lower minimum bets which attract a type of customer that is more prone to anger and violence.

64. Additionally, there is a significant reputation and standing a dealer achieves when they are assigned to deal at the high roller tables/Pit 7 and Roulette. When a dealer is no longer assigned to deal at the high roller tables/Pit 7 and Roulette and reassigned to the lower value tables it is looked upon as a huge demotion. This kind of reassignment also damages the dealer's reputation because it comes with the assumption that the dealer cannot properly deal.

65. Shortly after Mr. Seheut made his complaint, his standard schedule with only two possible different start times of 8:00 p.m. to 4:00 a.m. or 10:00 p.m. to 6:00 a.m. changed at times to an erratic, difficult to manage schedule with four different start times of 5:00 p.m. to 1:00 a.m. 6:00 p.m. to 2:00 a.m., 8:00 p.m. to 4:00 a.m., 10:00 p.m. to 6:00 a.m.

66. Additionally, he began being assigned to the lower value tables, where the players would be more erratic and hostile to the dealers and would not tip generously or at all. He was also no longer assigned to deal Roulette.

67. Mr. Seheut complained to his supervisors about the retaliation.

68. His supervisors ignored his complaints and did not provide any legitimate reason for the drastic change in his work conditions that began shortly after he made a formal complaint.

69. Despite the retaliation, Mr. Seheut continued to complain about safety and security, even though he was being retaliated against and being forced to work difficult hours at lower value tables, because his health was unable to take the stress and harassment.

70. The Casino created a hostile work environment for Mr. Seheut not only through ignoring all safety and security concerns but also forcing Mr. Seheut into schedules that were difficult and punitive.

71. Mr. Seheut attempted to work through the hostility and retaliation for two years before his health was in such disarray that the only way for Mr. Seheut to regain his health was to resign.

72. Mr. Seheut attempted to do everything he could to work through the hostility and retaliation.

73. The Casino created a hostile work environment that directly led to Mr. Seheut's resignation.

74. The Casino created such a hostile work environment that it was impossible for Mr. Seheut to conduct his duties and continue his employment.

75. Mr. Seheut is an immigrant from France to the United States.

76. The overwhelming majority of employees at the Casino are also immigrants and/or other minorities racial groups.

77. Mr. Seheut's immigration status is known to the Casino not only through his employment records, but he also has a heavy and distinguishable French accent.

78. The Casino is on notice that many of the employees are immigrants and/or minorities and that these immigrants and/or minorities have a hard time gaining employment and are therefore likely to endure the conditions of employment at the Casino, more so than non-immigrants and non-minority employees.

79. There are immigrant employees that have been sponsored by the Casino, in which if they want to gain a green card they must stay employed at the Casino.

80. The Casino's policies discriminate against immigrants and minorities because the Casino understands it can exploit the vulnerabilities of immigrants and minorities.

81. The Casino's treatment of Mr. Seheut, including the hostile work environment, the lack of adequate concern for his physical safety, and the retaliation for reporting his concerns to the Casino were discriminatory based on Mr. Seheut's national origin.

82. There are white American born naturalized citizens that are employed at the Casino, that have complained about the security concerns, and although the Casino took no action, they were not retaliated against in the same way that Mr. Seheut was.

83. Further, they were not mocked in the same way that Mr. Seheut was mocked for suggesting the "code of conduct."

84. The Casino mocked Mr. Seheut because of his national origin.

85. In similarly situations, the white American born naturalized citizens were not treated in the same fashion as Mr. Seheut or the other immigrants in both treatment and retaliation of reporting concerns to management at the Casino.

86. Upon information and belief, employees there were not white, or immigrants were not subjected to the same treatment as Mr. Seheut.

87. Mr. Seheut can name these similarly situation individuals.

## Causes of Action

### COUNT I

**Violation of Title VII of the Civil Rights Act of 1964**

**42 USC§ 2000e et seq.**

**Discrimination on the basis of national origin**

88. Mr. Seheut realleges and incorporates by reference each and every allegation

10

contained in the foregoing paragraphs of this Complaint with the same effect as though fully set forth herein.

89. Defendant violated Title VII by discrimination against Mr. Seheut on the basis of his national origin.

90. Defendant is on notice of Mr. Seheut's national origin.

91. Mr. Seheut was targeted for mistreatment and had his safety/security concerns ignored due to his national origin.

92. It is well-known among the Casino employees that the Defendant treats immigrants different then natural born white Americans.

93. Defendant has not treated any natural born white American employees the way the Casino treated Mr. Seheut.

## COUNT II

## Violation of Title VII of the Civil Rights Act of 1964

## 42 USC§ 2000e et seq.

## Retaliation

94. Mr. Seheut realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Complaint with the same effect as though fully set forth herein.

95. Defendant violated Title VII by retaliating against Mr. Seheut for filing a complaint against management regarding the safety and security issues at the Casino.

96. Defendant is on notice of Mr. Seheut's complaint.

97. Mr. Seheut had his shifts and positions demoted and changed directly after he filed his complaint.

98. Defendants' actions taken were retaliatory and harassing.

99. Mr. Seheut has the right to file complaints without fear of retaliation from the Defendant.

## COUNT III

### Maryland Common Law Tort

### Wrongful Discharge

100. Mr. Seheut realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Complaint with the same effect as though fully set forth herein.

101. Defendant violated Maryland Common Law by harassing and retaliating against Mr. Seheut's until he untimely was forced into a constructive discharge. It is against public policy to discriminate and retaliate against an employee.

102. Defendant's actions were taken with the intent of forcing Mr. Seheut into a constructive discharge.

103. Mr. Seheut had a legal right to file complaints without fear of retaliation from the Defendant.

## COUNT IV

### Violation of Title VII of the Civil Rights Act of 1964

### 42 USC§ 2000e et seq.

### Hostile Work Environment

104. Mr. Seheut realleges and incorporates by reference each and every allegation contained in the forgoing paragraphs of this Complaint with the same effect as through fully set forth.

105. Defendant violated Title VII subjecting Mr. Seheut to discrimination, harassment, retaliation, and constructive discharge based on his national origin.

106. Mr. Seheut is a first-generation immigrant to America; he was subjected to a hostile work environment with no security or safety and retaliation based on his national origin.

107. No other native born white American that worked with Mr. Seheut was ever subjected to the same treatment as Mr. Seheut.

## COUNT V

### Violation of Title VII of the Civil Rights Act of 1964

### 42 USC§ 2000e et seq.

### Hostile Work Environment Leading to Constructive Discharge

108. Mr. Seheut realleges and incorporates by reference each and every allegation contained in the forgoing paragraphs of this Complaint with the same effect as through fully set forth.

109. Defendant violated Title VII subjecting Mr. Seheut to discrimination, harassment, retaliation, and constructive discharge based on his national origin.

110. Mr. Seheut is a first-generation immigrant to America; he was subjected to a hostile work environment with no security or safety and retaliation based solely on his national origin.

111. No other native born white American that worked with Mr. Seheut was ever subjected to the same treatment as Mr. Seheut.

112. Defendants created a hostile work environment that impeded Mr. Seheut's ability to do his job to the point where he needed to resign.

## COUNT VII

## Violation of Title VII of the Civil Rights Act of 1964

## 42 USC§ 2000e et seq.

## Constructive Discharge

113. Mr. Seheut realleges and incorporates by reference each and every allegation contained in the forgoing paragraphs of this Complaint with the same effect as through fully set forth.

114. Defendant violated Title VII subjecting Mr. Seheut to discrimination, harassment, retaliation, and constructive discharge based on his national origin.

115. Mr. Seheut is a first-generation immigrant to America; he was subjected to a hostile work environment with no security or safety and retaliation based solely on his national origin.

116. No other native born white American that worked with Mr. Seheut was ever subjected to the same treatment as Mr. Seheut.

117. Defendants created a hostile work environment that impeded Mr. Seheut's ability to do his job to the point where he needed to resign.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ALAIN SEHEUT prays that judgment be entered in his favor and against Defendants PPE CASINO RESORTS MARYLAND, LLC for compensable damages, plus interest, statutory damages, punitive damages, attorneys' fees, expert witness fees, and his costs of suit, and such other relief as this Court deems just and equitable.

WHEREFORE, Plaintiff ALAIN SEHEUT prays that the Court order Defendant to 1) cease retaliating against employees that report safety/security concerns; 2) implement internal

policies and procedures designed to ensure that employees do not run afoul of the antidiscrimination laws of the United States and; 3) cease all activities, employment practices, and internal policies that create a hostile discriminatory environment against immigrants.

## DEMAND FOR JURY TRIAL

Plaintiff ALAIN SEHEUT demands a trial by jury.

Respectfully Submitted,

*Sarah Spitalnick*

Sarah Spitalnick Esq.
23 Walker Ave., Suite 207
Pikesville, MD 21208
Phone: (484) 332-0454
MD Bar ID: 23112901
sarahspitalnickesq@gmail.com

Jonathan Gross Esq.
2833 Smith Ave., Suite 331
Baltimore MD, 21209
Phone: (443) 813-0141
MD Bar ID: 1912170138
jonathansgross@gmail.com
*Counsel for Plaintiff*

## MARYLAND RULE 20-201 CERTIFICATION

**I HEREBY CERTIFY** that this submission does not contain any restricted information. Or if it does contain restricted information, a redacted submission has been filed contemporaneously pursuant to subsection (f)(2) of the above-referenced rule.

*Sarah Spitalnick*

Sarah Spitalnick Esq.
*Counsel for Plaintiff*